414 So.2d 1384 (1982)
O. J. RIVERO TOWING COMPANY
v.
COASTAL FLEX COMPANY, INC., and Continental Underwriters, Ltd.
No. 5-14.
Court of Appeal of Louisiana, Fourth Circuit.
May 11, 1982.
Ralph L. Barnett, George P. Vedros, Gretna, for O. J. Rivero Towing Co., plaintiff-appellee.
Liskow & Lewis, S. Gene Fendler, New Orleans, for Coastal Flex Co., Inc., defendant-appellant.
Before BOUTALL, CHEHARDY and KLIEBERT, JJ.
CHEHARDY, Judge.
Plaintiff, O. J. Rivero Towing Company, brought this suit for damages against Coastal Flex Company, Inc., caused by defective exhaust equipment sold to plaintiff by that defendant.[1] Coastal Flex answered *1385 in the form of a general denial and reconvened for the cost of materials ordered but not paid for by plaintiff.
Following trial, judgment was rendered in favor of plaintiff in the sum of $62,457.55. Coastal Flex has suspensively appealed.

FACTS
On or about April 17, 1979 the exhaust system of plaintiff's tow boat, the M/V DOMINGO A. RIVERO, was found to have an exhaust leakage problem. Offrie Rivero, the chief executive officer of plaintiff company, called upon David Legnon, the shop foreman of Coastal Flex, to remedy the situation. Legnon went to the vessel, examined the exhaust system and made measurements.
The temperature to which the system was exposed was an important consideration. Rivero informed Legnon the temperature recommended to run the engine did not exceed 800 degrees, although the engines were usually operated at 750 to 760 degrees. Rivero wanted something that would withstand a somewhat higher temperature.
Plaintiff's employees dismantled the exhaust manifolds, which were then delivered to Coastal Flex for the agreed-upon repairs. When the work was completed it was returned to plaintiff and installed by plaintiff's employees with some difficulty. The tow boat was then put back in service under a charter agreement with Barge Management, Inc. It operated successfully for about two days when it was noted that there was a leak in the exhaust system. Rivero was informed and instructed the captain to use his own judgment. The vessel, with two barges in tow, continued its journey for about 18 hours, when it was finally stopped due to the leakage which had gotten progressively worse. Barge Management was notified and sent another vessel to pick up its barges.
Rivero meanwhile contacted Legnon and ordered materials which would withstand higher temperatures. When these were delivered Rivero returned all but one which he kept to compare with the original order. Coastal Flex has not been paid for either the first or the second order.
The vessel proceeded under its own power with the leakage unrepaired to Avondale Shipyards, where the exhaust system was dismantled, repaired and reassembled at a cost of $16,593.00.
Plaintiff then instituted this suit for itemized damages totaling $93,761.96. The trial court award was itemized as follows:

1. Loss of vessel for 21
 days at $1,800.00 a
 day $37,800.00
2. Fuel and oil for five
 days from April
 26, 1979 through
 April 30, 1979 at
 $800.00 a day 4,000.00
3. Repairs by Karl
 Senner, Inc. 2,367.00
4. Repairs by Bourne
 Electrical 956.65
5. Repairs by Marine
 Engineering, Inc. 740.90
6. Repairs by Avondale
 Shipyards 16,593.00
 ___________
 Total damages
 awarded $62,457.55

SPECIFICATION OF ERRORS
Appellant claims the trial court erred in:
1. failing to find that actions of the appellee were the cause of failure of the flexible hoses supplied by appellant;
2. awarding the cost of repairs by Avondale Shipyards to appellee;
3. awarding loss of use, or downtime, and alternatively, the award was excessive;
4. awarding damages for alleged losses for fuel and oil, and alternatively, the award was excessive;
5. awarding damages for costs of repairs of three subcontractors; and
6. denying appellant the cost of its outstanding invoices against appellee, plus reasonable attorney's fees.
*1386 Relative to appellant's first contention, it is its position that appellee was responsible for the resultant damages because the material supplied was made to specifications set by Rivero, and not based on recommendations of Legnon, and further, the product failed due to improper installation by plaintiff's employees and was not due to improper measurements made by Legnon.
The trial court, in its reasons for judgment, concluded Legnon's recommendations and measurements were relied upon by plaintiff, that the couplings provided were not sufficient to serve the purpose for which they were ordered, and that inaccurate measurement was the cause of the improper fitting. Additionally, the court found plaintiff's installation of the couplings in no way contributed to the failure.
Appellant claims these findings are inaccurate. For answer to these questions we turn first to the testimony of O. J. Rivero and David Legnon.
According to Rivera's testimony he did not specify the type of material to be used, or how the couplings or flexes should be manufactured or fabricated, requiring only that it be able to withstand temperatures somewhat higher than 800 degrees. After Legnon visited the vessel, examined the exhaust system and made measurements, the order was placed with defendant. Plaintiff's employees dismantled the exhaust system and delivered it to defendant. The cutting of the manifolds and fitting the couplings was done by defendant. After the work was completed it was returned by defendant to the vessel and installed by plaintiff's employees. There was some difficulty in the installation because several of the couplings were out of alignment one-quarter to one-half inch, but they were bent to fit. The next day Rivero discussed the problem with Legnon, who told him not to worry they were made to bend. Legnon was not asked to help with the installation, or to inspect it, nor did he offer to do so. After the work was completed the vessel was put back in operation. After two or three days, leakage was discovered at the couplings and the boat was forced to tie up for several days after which it was taken to Avondale for repairs.
Legnon testified after examining the exhaust system and discussing the requirements with Rivero he recommended the use of 321 stainless steel which will withstand temperature of 1200 degrees. Following receipt of plaintiff's order he called the vendor and advised him the couplings and flexes were for use with a Brons engine, gave him the dimensions and flanges needed, and ordered them made according to specifications given to him by Rivero (i.e. ability to withstand temperatures somewhat in excess of 800 degrees). They were manufactured to withstand temperatures of 1200 degrees. His company was not equipped to provide installation nor to inspect the completed installation although Rivero phoned him the next day to say they had a slight problem in the installation which had been resolved.
After defendant was advised of the leakage problem plaintiff ordered additional couplings of a better quality. When this order was delivered it was returned. Legnon went to see the vessel when it was at Avondale and concluded the malfunction was due to improper installation.
Concerning the installation of the equipment we look to the testimony of Vincent Gauthreaux, engineer aboard the vessel who installed the flex couplings along with Herbert Rivero. Gauthreaux had never installed flex couplings previously and had problems putting them back together. It took all night and most of the next day to complete the work. To get the manifold back under the turbo charger he had to loosen the flex pipes. When these were put back together they were slightly out of alignment. When the flexes were delivered they were attached to the manifold, but he had to disassemble them to put them on the engine. He twisted the flex pipes which were out of alignment to make them fit. At no time did he request instructions from defendant relative to installation.
It is clear from the testimony thus adduced that the couplings and flexes were made according to plaintiff's instructions, *1387 that they should be able to withstand temperatures in excess of 800 degrees. The measurements were made by defendant and manufactured according to its recommendations. The installation was performed by plaintiff's employees without instruction or supervision from defendant.
As to why the system failed, the only expert to testify was William G. Mitchell, the estimating engineer at Avondale's Harvey yard. His testimony was offered by plaintiff. He examined the flex couplings removed from the system following the malfunction and described the material as mild steel flanges with stainless steel bellows. He was unable to tell whether the material used was 321 stainless in the absence of a chemical analysis, but 321 stainless is recommended for temperatures from 800 to 1200 degrees, and that was the material supplied by Avondale when the repairs were made. This can be ordered with or without a heat shield. The heat shield will withstand temperatures up to 1600 to 1800 degrees. He suggested the heat shield after examining the material that was already on, and for some explanation as to why it failed.
Mitchell contacted a former dealer of Brons engines and found the exhaust temperature in the area of the flexes was 1600 degrees and that under heavy load conditions the exhaust temperatures can go as high as 1800 degrees.
Under normal conditions a flex built to withstand 1000 degrees will burn up when exposed to 1600-degree temperature (without the heat shield).
The original flexes had been misaligned on the vertical as well as horizontal. He said they had been pulled into position to connect the floating flange when they were originally installed and the effect of the misalignment on the failure of the couplings is that when you are stretching one side you are compressing the other. When it is then exposed to heat they cannot expand uniformly.
Mitchell concluded the malfunction occurred because the material supplied was not able to withstand the necessary temperatures, or the lack of a heat shield, or improper alloy. By visual inspection the fact that the corrugations had been distorted made it evident that they were misaligned. They were not expanding and retaining the general configuration they were in when purchased.
In response to a question as to whether the misalignment came from the installation or the measurements taken for the production or manufacture of the couplings he stated the couplings cannot be installed properly in more than one manner, and if someone took measurements the flex couplings should fit properly. However he stated the misalignment would be in the installation and not in the measurements.
"Q Okay and if the measurements are wrong then will you have a misalignment such as appears on `P-3'?
A No, sir. Measurements cannot create the misalignment. The misalignment is at the time of installation. It is not on the overall measuring, overall length of the flange. If you have a flangeif you have a flexible in a line it is from A to B, from two points. This is the opening that you have to install a flexible. Now whether one pipe is in line or the other, I mean it's not in the measurement itself. When you measure, you measure from A to B to get the overall from face to face of the two flanges. And this you assume is your overall length. Then your two pipes that interconnect are supposed to be in line vertically and horizontally so that you have the proper connection between your two flanges without creating any undue stress to the flexible itself.
Q Now, in looking at `P-3' flex coupling, would you have expected this flange to have failed within two days, 20 hours of running, just from the misalignment?
A Under normal installation, no, sir.
Q What would you attribute then the failure within 20 hours or within two days of running?
A The misalignment, improper material." Tr. pp. 29-30.
*1388 Appellant contends that the material supplied was sufficient to withstand temperatures up to 1000 or 1200 degrees and thus complied with the order placed by plaintiff. Rivero confirms he ordered material to withstand temperatures somewhat higher than 800 degrees, and plaintiff's expert confirms that 321 stainless is recommended to withstand temperatures up to 1200 degrees. Apparently the temperature far exceeded 1200 degrees in Brons engines pulling a heavy load, according to information elicited by plaintiff's expert.
We have carefully examined Rivero's testimony and it is apparent he was unaware of such extremes in temperature, contending that at 1600 degrees it would burn up. Had defendant been made aware of the extreme temperature requirement, the material suggested and/or the use of a heat shield could have been recommended. It appears to us therefore that the use of improper material was imputable to plaintiff's failure to correctly advise defendant about the temperature requirement.
It is also clear from plaintiff's expert testimony that improper installation, and not improper measurements, was also responsible for the malfunction. Plaintiff did not request defendant to install the product, nor did defendant offer such services, or supervise the installation. It was not a part of the purchase price, or contemplated by either party. Plaintiff received what it ordered, based upon information supplied by it to defendant, and that material supplied was improperly installed. Neither of these factors was attributable to defendant.
Because of our determination in the first specification of error we find it unnecessary to discuss Errors 2 through 5 and turn our attention to Error No. 6.
Appellant contends it is entitled to recover the cost of the products supplied, $5,061.06, plus attorney's fees under the provisions of R.S. 9:2781. This statute provides in pertinent part when any person fails to pay on an open account within 30 days after receipt of written demand correctly setting forth the amount owed and a copy of the invoices in support thereof, that person shall be liable for reasonable attorney's fees for the prosecution and collection of such claim when judgment is rendered in favor of the claimant.
We are of the opinion that plaintiff is entitled to be paid for the material it supplied, based on plaintiff's specifications, in the sum of $5,061.06 as prayed, but we reject the claim for attorney's fees.
The work involved was for a single job and the record contains no evidence of other business transactions between plaintiff and defendant, or any expectation of future dealings. Under these circumstances we cannot find that this action is on an open account entitling plaintiff to attorney's fees. Womack Bros. v. Equipment Rental Services, 399 So.2d 661 (La.App. 1st Cir. 1981); Jenkins v. Dicon, Inc., 387 So.2d 649 (La.App. 1st Cir. 1980); Benglis Sash & Door Co., Inc. v. Leonards, 378 So.2d 992 (La.App. 3d Cir. 1979), reversed on other grounds, 387 So.2d 1171 (La.1980); Richards v. Gulfco Electronics Corp., 360 So.2d 609 (La.App. 4th Cir. 1978), writ denied, 363 So.2d 69 (La.1978). Accordingly we reject plaintiff's request for attorney's fees.
For the reasons assigned the judgment appealed from is reversed and it is now ordered that there be judgment on the main demand in favor of defendant Coastal Flex Company, Inc., and against plaintiff, O. J. Rivero Towing Company, dismissing plaintiff's demands. And it is further ordered that there be judgment on the reconventional demand in favor of plaintiff-in-reconvention Coastal Flex Company, Inc., and against the defendant-in-reconvention O. J. Rivero Towing Company in the full sum of $5,061.06, with interest from date of judicial demand until paid. All costs in both courts are to be paid by plaintiff, O. J. Rivero Towing Company.
REVERSED.
NOTES
[1] Various other defendants were named by the original and supplemental and amended petitions, all of whom were insurers under hull and machinery insurance policies. No judgment was rendered against those defendants, and they are not before this court.